**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

TIMOTHY C. BORUP,
individually and on behalf of all
others similarly situated,

Court File No. 0:18-cv-01647-PAM-DTS

Plaintiff,

v..

THE CJS SOLUTIONS GROUP,
LLC, d/b/a THE HCI GROUP,

Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL EMPLOYEE LIST DOCUMENTS AND TO SUPPLEMENT THE RECORD CONCERNING BORUP'S FIRST MOTION TO COMPEL (ECF 21) BASED UPON NEWLY DISCOVERED INFORMATION**

---

**INTRODUCTION**

The instant Motion is the second Rule 37 motion filed by Plaintiff Timothy Borup ("Borup") seeking discovery relating to similarly situated workers. This supporting memorandum also sets forth important facts and circumstances discovered and/or occurring *after* the January 22, 2019 hearing before this Court on Borup's first Motion to Compel (ECF 21). These facts and circumstances establish the existence of highly prejudicial and ongoing "reverse auction." The presence of a reverse auction increases the need for the plaintiffs' attorneys to fairly and freely communicate with affected workers. Finally, because of the current scheduling order, the applicable statutes of limitations, and the presence of a reverse auction, Borup requests full production of

documents responsive to the requests that are the subject of his two pending motions within five days of this Court's order.

Communications between putative counsel and putative collective action members concerning the status of a lawsuit, and the potential of joining one or another lawsuit, is critically important to putative collective action members.  As one federal court observed, workers have a right to be apprised of pending FLSA lawsuits, and the claims asserted therein, to which they may be entitled to join. *See Gordon v. Kaleida Health*, 727 F. Supp.2d 91 (W.D.N.Y. 2010). In *Gordon*, the court noted "the employees' important interests, created by the FLSA, to be appraised of … their right to elect to consent to join in the action to gain the additional compensation to which Plaintiffs assert they and similarly situated employees are entitled."  *Id*. at 98 (also noting "Plaintiffs' counsels' need to foster awareness of the statutory rights of Defendants' employees").

The need to "appraised" of a lawsuit includes not only the claims in the pending FLSA action, but also the right to participate in another FLSA lawsuit involving additional or alternative FLSA claims. The *Gordon* court allowed pre-certification communications with workers who had not chosen a lawsuit in which to participate, and specifically included "Defendants' employees who did not opt into the conditionally certified collective action, as well as those employees who could be included in any subsequently certified collective or class action regarding Plaintiffs' other claims, such as for unpaid shift-change and mandated training time." *Id.*at 100.

Here, as will be discussed below, the workers' claims are already being negotiated by counsel in a different case, *Gray v. The CJS Solutions, Group, LLC*—and on a reverse

auction basis. There is no legitimate basis for barring any communications between the workers for whom HCI is currently negotiating their rights, on the one hand, and the lawyers in the competing plaintiffs' cases, on the other hand. The flow of information to the workers should be commenced immediately, so attorneys can hear from the workers as to the settlements they would like to achieve while their claims are being litigated and negotiated.

## BACKGROUND

### A.   THE *GRAY* LITIGATION AND THE PENDING REVERSE AUCTION

1.      On June 13, 2018, Borup filed this lawsuit on behalf of himself and other similarly situated independent contractors who worked for HCI. ECF 1. At the time of his retention, Borup was a medical school student who worked for HCI teaching Mayo Clinic employees how to use a commercial software program called Epic that had been recently purchased by the Mayo Clinic. Most Mayo Clinic employees were unfamiliar with the software.

2.      HCI exercised full control over Borup's work schedule, his work attire, where he worked, his rate of compensation, the form contracts he signed, his travel schedule, his job responsibilities, his break time, how he recorded his work time, his hotel arrangements, his auto travel, his air travel, the mandatory training he received from HCI before working, his per diem rate, etc. ECF 1, ¶¶ 17-28. HCI maintained exclusive authority to fire Borup based upon inadequate performance. *See id.* at ¶ 26.c.

3.      In this lawsuit, Borup contends that he and others similarly situated were purposely misclassified by HCI as independent contractors so that HCI could avoid

paying overtime. *See generally id.* The United States Department of Labor has been clear, in long-standing opinion letters, that a person teaching computer software skills to corporate customers are performing activities that are not exempt from overtime compensation.[1] Because it would have to pay ordinary employees overtime, it was in HCI's financial best interest to misclassify workers like Borup as independent contractors.

4.    In this lawsuit, Borup seeks to represent all HCI independent contractor workers who taught software skills, with the sole exception of claims released from an earlier settlement against HCI referred to in Borup's initial Motion to Compel papers as the "*Sanders* settlement."[2]

5.    To date, and since the January 22, 2019 hearing, 9 workers have opted into the *Borup* lawsuit. The opt-ins include workers who worked on non-Mayo, non-Minnesota projects.

6.    On August 14, 2018, a parallel, overlapping FLSA lawsuit seeking collective action status was filed in the Southern District of New York by a different independent contractor who taught software skills and who did not participate in the

---

[1] USDOL Opinion Letter, 1999 WL 1788144 (Aug. 19, 1999); USDOL Opinion Letter, 1998 WL 1147742 (December 4, 1999); Janette Frisch, *You may have to Pay Your IT Employees Overtime,* Blog (Dec. 26, 2013), *available at:* http://theemplawyerologist.com/2013/12/26/what-you-may-have-to-pay-your-it-employees-overtime/#comments ("where the primary responsibility is … training customers in specialized computer software … [the activities] are not exempt") (last visited 2/11/2019).

[2] *Sanders v. The CJS Solutions Group, LLC d/b/a The HCI Group,* No. 17-3809 (S.D.N.Y.)

*Sanders* settlement. *See* Complaint, *Gray v. The CJS Solutions, Group, LLC*, Case No. 18-CV-7336 (S.D.N.Y. filed Aug. 14, 2018).  To date, 5 workers have opted into the *Gray* lawsuit.

7.    Neither class nor collective action notice has been issued in either lawsuit, and most of the eligible workers (estimated between 1000 and 2000) are unaware of the existence of the respective lawsuits, much less their right to choose which lawsuit to opt-into.

8.    Borup's counsel was not aware of the existence of the later-filed *Gray* lawsuit or any other pending lawsuit until Thursday, January 31, 2019.

9.    On September 18, 2018, the parties to the *Borup* lawsuit entered into a nationwide tolling agreement for all putative collective action members.  HCI demanded that Borup agree to its chosen mediator, John Phillips, of Husch Blackwell in Kansas City, Missouri.  HCI's mediator scheduled an in-person mediation session for November 28, 2018.

10.    At the same time, and unbeknownst to Borup's counsel, HCI was choosing a different mediator for the overlapping *Gray* lawsuit with different Plaintiffs' counsel. Specifically, in the later-filed *Gray* lawsuit, HCI was negotiating with Stephen Sonnenberg of JAMS Endispute in New York.  According to filings in the later-filed *Gray* case, Mr. Sonnenberg was to preside over an initial mediation on December 13, 2018 and then, again, on January 10, 2019.

11.    A "reverse auction" takes place when a defendant seeks to *separately* negotiate with different groups of plaintiffs' attorneys on behalf of the same group of

people—and then settles only with the attorneys who provide the steepest discount to class members.  Reverse auctions are not permitted by federal courts.  As 4 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 13:57 (5th ed. updated Nov. 2018) instructs:

> In a normal auction, the seller accepts the highest bid. In a reverse auction, the seller looks for the lowest bid. As applied to class actions, the defendant is conceptualized as "selling" a settlement and is looking to do so for the lowest amount of money possible. This quest is aided when there are multiple class actions with multiple class counsel "bidding" to buy the settlement. Each set of class counsel should, in theory, hold out for a higher amount from the defendant because they get a percentage of whatever settlement amount they secure. However, the hitch that enables a reverse auction is that, generally speaking, only one set of plaintiffs' attorneys— those that settle—will get any fees, and attorneys pursuing all the parallel cases will get nothing. Therefore, the defendant can play the plaintiffs' attorneys off against one another, bargaining down the price of the settlement in exchange for ensuring the lowest selling attorneys that they will be the ones to get a fee out of the case. The problem in the reverse auction situation is that the class's interests have been sold out, and class members will get less than the full value of their claims.

*Id.*

12.    "Markers of a reverse auction include the presence of overlapping class actions involving similar claims against the same defendant; settlement discussions initiated by the defendant; settlement bargaining limited to one of the competing groups of plaintiffs' attorneys; settlement with the group of attorneys who present a less substantial threat of carrying the case forward to trial; lack of an extended process of settlement bargaining; [and] agreements that promote the award of lucrative and potentially unjustified attorneys' fees …"  Jonathan R. Macey, *Judicial Review of Class Action Settlements*, 1 J. LEGAL ANAL. 167, 191 (2009)

13.     During settlement negotiations with HCI, Borup's counsel made specific settlement recommendations for the putative collective action members—including the workers who chose not to participate in the *Sanders* settlement—and included amounts for unpaid wages, travel time and liquidated damages.[3]   Borup was not aware of the existence of other litigation during these negotiations.

14.     HCI specifically rejected all of Borup's settlement recommendations for the collective action members' unpaid wages as "too high."   HCI then withdrew from negotiations in *Borup*.

15.     The tolling period in the *Borup* case formally ended on December 5, 2018.

16.     At no time during the collective action settlement negotiations with Borup did HCI inform Borup or his counsel of: (1) the existence of the parallel, overlapping later-filed litigation; (2) the existence of another chosen mediator; (3) the existence of another chosen mediation date immediately after the scheduled mediation date set in *Borup*; or (4) the amounts of any recommended demands and offers for the putative collective action members presented by HCI and the plaintiff's counsel in the later-filed *Gray* case.

17.     According to filings in the later-filed *Gray* action, HCI was negotiating with different plaintiff's counsel concerning a nationwide settlement at the time of the

---

[3]Because court approval is required for any FLSA collective action settlement, *McInnis v. Ecolab Inc.*, No. 11-02196 (SRN/JJK), 2012 WL 892187, at *1-2 (D. Minn. Feb. 17, 2012), as well as any class action settlement, Fed. R. Civ. P. 23, Borup cannot make a binding offer for settlement, and can only provide HCI with the terms for which he and his counsel would recommend settlement to putative collective action members and the Court.

hearing before this Court (January 22, 2019) on Borup's initial Motion to Compel—for the very workers at issue in Borup's motion.

18.     The attorneys in the *Gray* case have informed Borup's counsel that they will not coordinate with Borupt's counsel nor disclose the negotiation positions that they and HCI have taken with respect to the workers at issue in both lawsuits.

**B.     FACTS CONCERNING CURRENT MOTION TO COMPEL**

19.     On January 4, 2019, Borup served a document request seeking:

> For all workers identified in Interrogatory No. 1 (served on December 19, 2018), that portion of your records that shows the workers' full names, last known addresses, last known e-mail addresses, last known telephone numbers, and job titles.

Ex. A, Pl.'s Second Set of Requests for Production of Documents, Request No. 1.

20.     On January 22, 2019, this Court heard oral argument concerning a motion to compel relating to Borup's First Sets of Requests for Production of Documents and Interrogatories, which focused in large part on the discovery of putative collective action members' identities. ECF 21. In particular, HCI has attempted to preclude Borup from gaining access to any information concerning non-Mayo employees.

21.     At the hearing, this Court orally ordered HCI to provide, *at the least*, information concerning all of its consultants who worked the Epic go live event at the Mayo Clinic.

22.     After the January 22, 2019 hearing, HCI responded to the new interrogatory by refusing Borup any discovery into worker identities, despite being ordered to provide similar information for Mayo location workers in response to other requests.  HCI stated:

8

**RESPONSE:** For the reasons set forth in Defendant's Responses to Plaintiff Borup's First Set of Request for Production of Documents and Response to Motion to Compel, Defendant objects to the production of this information and will await ruling from the Court on the pending Motion to Compel to further respond.

Ex. B, Def.'s Responses to Pl. Borup's Second Set of Requests for the Production of Documents. HCI's position, that it will provide not identifying information for any Mayo worker, directly conflicts with the Court's instructions at the January 22, 2019 hearing.

## ARGUMENT

## I.    DISTRICT COURTS ROUTINELY ORDER PRE-CERTIFICATION DISCOVERY OF PUTATIVE COLLECTIVE AND CLASS MEMBER CONTACT INFORMATION.

The great weight of legal authority, including two District of Minnesota decisions, expressly grants plaintiffs in FLSA putative collective actions the right to discover the contact information for members of the class *for purposes of conditional certification proceedings*. *Holaway v. Stratasys, Inc.*, No. 12-998 (PAM/JSM), 2012 WL 12895690, at *2 (D. Minn. Oct. 30, 2012) (denying, in relevant part, appeal of magistrate's order compelling production of contact information for putative FLSA collective action members, recognizing that the requested information was "undoubtedly relevant" "[r]egardless of whether [plaintiff] claimed to need the compelled information at the conditional certification stage or at the liability stage"); *Bailey v. Ameriquest Mortg. Co.*, No. 01-545 (JRT/FLN), 2002 WL 100388, at *2 (D. Minn. Jan. 23, 2002) (Tunheim, J., affirming order of Noel, M.J., compelling pre-certification discovery of information concerning putative opt-in plaintiffs during relevant timeframe, and specifically rejecting employer's argument that conditional

9

certification must precede such discovery). Indeed, "[d]istrict courts addressing whether to permit discovery of similarly-situated employees' names and addresses in section 216(b) actions have 'almost universally' allowed discovery of the information." *Helmert v. Butterball, LLC,* No. 08-342, 2008 WL 5272959, at *2 (E.D. Ark. Dec. 15, 2008); *accord Stebbins v. S&P Oyster Co.*, No. 16-00992, 2017 WL 1246334, at *3 (D. Conn. Apr. 3, 2017) ("Pre-certification discovery of potential class lists is favored by most cases considering the question, within the contexts of Rule 23, FLSA, or both." (internal quotation and citation omitted)); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, No. 09-1148, 2010 WL 2362981, at *2 (S.D.N.Y. June 14, 2010) ("the weight of authority … counsels in favor in of allowing [pre-certification] disclosures [of contact information] in FLSA cases"; citing cases); *Hammond v. Lowe's Home Ctrs., Inc.,* 216 F.R.D. 666, 673 and n.23 (D. Kan. 2003) (recognizing that district courts "almost universally" permit pre-certification discovery of putative collective action members' contact information; citing cases).

As one district court explained:

> [C]onditional certification is not a prerequisite to the turnover of information concerning the identity of potential class members.... Indeed, the information that Fei seeks obviously will be of considerable help to Fei in his efforts to define the class.... Furthermore, allowing Fei to discover the identity of potential opt-ins at an early stage may help the plaintiffs show that there are enough similarly-situated plaintiffs that the action should be conditionally certified.

*Fei v. WestLB AG,* No. 07 Civ. 8785, 2008 WL 7863592, at *2 (S.D.N.Y. Apr. 23, 2008); *accord Morden v. T-Mobile USA, Inc.*, No. 05-2112, 2006 WL 1727987, at *2-4 (W.D. Wash. June 22, 2006) (granting plaintiffs' pre-certification motion to compel

list of employees in FLSA misclassification and off-the-clock case; discovery was necessary for plaintiff to properly define class and defendant made no showing as to burden associated with requested discovery). This reasoning is consistent with Judge Magnuson's and Magistrate Mayeron's reasoning in *Holaway*, *supra*. 2012 WL 12895690, at *2; *Holaway v. Stratasys, Inc.*, No. 12-998 (PAM/JSM), 2012 WL 12897218, at *4 (D. Minn. Sept. 24, 2012) (Mayeron, M.J.) (recognizing information sought "could bear fruit on plaintiff's claim that he and the other FSEs were similarly situated, which is directly relevant to conditional class certification" and, further, putative class members "may have information that could lead to discovery of admissible evidence at trial bearing on liability—i.e., whether the nature of the work they performed was properly characterized as exempt.").[4]

In opposition to Borup's initial motion to compel, HCI argued that Borup failed to make an artificial threshold showing of similar-situation in order to obtain pre-certification discovery of putative class members' contact information. *See* ECF 33, at 16. Not so. "Even where a plaintiff's motion to certify an FLSA collective action fails to assert facts sufficient to meet the § 216(b) threshold, courts ... have often ordered the disclosure of contact information for potential opt-in plaintiffs so

---

[4] The same rationale also applies equally to putative wage-and-hour class actions under Rule 23 of the Federal Rules of Civil Procedure. *See, e.g., Youngblood v. Family Dollar Stores, Inc.,* No. 09-3176, 2011 WL 1742109 (S.D.N.Y. Jan. 5, 2011) (observing, in putative Rule 23 class action challenging employees' classification as exempt from overtime compensation requirements, "Plaintiffs clearly will not be able to prove the similarity in class members' 'actual duties' without contacting members of the putative class"; noting, "a number of courts, in this district and elsewhere, have concluded that pre-certification disclosure of the names and addresses of putative class members in wage and hour cases is appropriate").

that discovery into the collective allegations could continue and the plaintiffs could renew their motion for certification at a later date." *Stebbins*, 2017 WL 1246334, at \*4. As the *Stebbins* court reasoned in rejecting an argument similar to HCI's here, and ordering production of contact information for putative opt-in plaintiffs: "If defendants wish to argue in one context that the plaintiffs lack adequate factual information, the Court is hard-pressed to find in another context that defendants should be permitted to withhold that information." *Id.* at n.3.

## II.   FURTHER DELAY IN DISCOVERY OF THE WORKERS' IDENTITIES PREJUDICES PUTATIVE CLASS MEMBERS.

Since HCI is now reverse auctioning the claims of the very workers that both the *Borup* and *Gray* lawsuits seek to represent, while simultaneously refusing to provide information that would allow plaintiffs' lawyers to inform the same workers of the negotiations and their rights, any continued delay serves only to aid HCI's improper reverse auction strategy.  Delay also serves to run out the statute of limitations on claims arising from 2016 go live projects.  Such dilatory tactics should not be countenanced.

HCI's objections to identifying workers is highly prejudicial to the putative collective and class members. Now that HCI has negotiated with two different sets of lawyers, and entered into a tolling agreement for the employees' rights in this case, the identities of the workers at issue can no longer in good conscience be shielded. The workers have a right to know how their respective claims are being negotiated, by what attorneys, and whether they have alternative options for resolution of their claims. Certainly, it is imperative that workers learn about all potential lawsuits in which they

12

can participate and, just as importantly, how the different plaintiffs' attorneys value their claims.

Now that HCI is negotiating with different counsel about these same workers' claims, there can be no claim of prejudice. HCI clearly has the data and information (including identifying information) to negotiate these workers' claims. The only "prejudice" HCI can claim is not being able to unilaterally choose opposing counsel for the workers at issue.

### III.   HCI SETTLEMENT NEGOTIATIONS PROVE A COLLECTIVE ACTION CAN BE MAINTAINED FOR NON-SETTLING WORKERS.

This Court's primary question for the parties at the January 22, 2019 hearing was whether a collective action could be maintained on behalf of workers who chose not to participate in the *Sanders* settlement. HCI claimed that another collective action could not be maintained—despite knowing that another, parallel collective action *already existed*.

Specifically, HCI's counsel made two arguments. First, HCI argued that under applicable law, no collective action could ever be brought on behalf of non-participating *Sanders* settlement workers because they had already received notice. Certainly, HCI did *not* apprise the Court of the fact that HCI is trying to settle, on a reverse auction basis, a parallel collective action for the very same group of workers—but with the plaintiff's counsel of its choosing.

Second, HCI specifically argued that discovery for non-participating *Sanders* settlement workers should not be allowed because there was no proof of interest by non-

13

participating workers in pursuing their FLSA claims. Once again, HCI did *not* apprise the Court that, while it argued no other worker wanted to participate in this case, HCI was simultaneously trying to enter into a national settlement of pending claims by other workers.  Since the January 22, 2019 hearing before this Court, and as predicted by Borup's counsel, several new workers have opted into Borup's lawsuit, and these filings are expected to continue.

## CONCLUSION

Borup respectfully requests that the Court grant the instant motion to compel, and also grant the pending motion to compel (ECF 21), in their entirety.  He further requests HCI produce responsive documents within five days of the Magistrate's order.

Dated: February 12, 2019

LARSON • KING, LLP

By: *s/T. Joseph Snodgrass*
T. Joseph Snodgrass (MN #231071)
Kelly A. Lelo (MN #330838)
30 East Seventh St., Suite 2800
St. Paul, MN  55101
Tel: (651) 312-6500
Fax: (651) 312-6618
jsnodgrass@larsonking.com
klelo@larsonking.com

and

Thomas A. Jacobson (MN #0265810)
SWENSON LERVICK SYVERSON
   TROSVIG JACOBSON CASS, PA
710 Broadway Street
Alexandria, MN 56308
Tel: (320) 421-6447
Fax: (320) 763-3657
taj@alexandriamnlaw.com

*Attorneys for Plaintiff and the Proposed Classes*

14