# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SHANA GRAY, Individually and on behalf of all others similarly situated, | : | Civil Action No. 18-cv-7336 GWH |
| | : | |
| | : | ECF CASE |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CJS SOLUTIONS GROUP, LLC d/b/a THE HCI GROUP, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PROPOSED INTERVENOR BORUP'S OBJECTIONS TO
PLAINTIFF'S MOTION FOR APPROVAL OF FLSA SETTLEMENT (Dkt. 51)**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

FACTS ....................................................................................................................................1

    A. *The ATE Workers – Hours Worked And Pay Received* ..............................................1

    B. The Proposed Settlement Provides Workers With Approximately
       10% Of The Value Of Their Unpaid FLSA Claim ......................................................4

    C. Chronology Of The Settlement Negotiations In *Borup v. HCI* ...................................5

    D. The *Gray* Proposed Settlement Increased The Nuisance Value
       Claim Rejected By The Workers In *Borup* By 3% Obtains No
       Travel Time Or Liquidated Damages, But Increases HCI's
       Offer For Attorneys' Fees And Costs By 5.7 Fold. ....................................................8

    E. The Proposed *Gray* Settlement Is Far Below The Value Of The
       *Sanders* Settlement.....................................................................................................9

    F. The Proposed *Gray* Settlement Is Far Below The Value Of The
       *McFarlane* Settlement ..............................................................................................10

ARGUMENT ........................................................................................................................11

    A. Standard Of Review ..................................................................................................11

    B. The Proposed Settlement Was Not Fairly And Honestly Negotiated.........................12

    C. Gray Has Not Offered Any Information Or Evidence Concerning The
       Disputed Claims and Defenses ..................................................................................13

        1. *The Absence Of Information Concerning The Back Wages Claim* ......................13

        2. *The Absence Of Information Concerning The Seminal Independent
           Contractor Issue*.............................................................................................15

        3. *Absence Of Information Concerning Overtime Exemptions*................................16

        4. *Absence Of Information Concerning Statute of Limitations*................................16

        5. *Absence Of Information Concerning Hours Worked*...........................................17

        6. *The Absence Of Information Concerning Liquidated Damages*...........................17

    D. The Value Of An Immediate Recovery Does Not Outweigh The Mere
       Possibility Of Protracted Litigation ..........................................................................19

    E. The Proposed Attorneys' Fees And Costs Are Not Supported Or Appropriate .........19

CONCLUSION.....................................................................................................................21

# TABLE OF AUTHORITIES

Cases

*Cabrera v. CBS Corp.,* No. 17-CV-6011, 2019 WL 502131 (S.D.N.Y. Feb. 8, 2019) .................11

*Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199 (2d Cir. 2015) .......................................11

*Cisneros v. Schnipper Rest. LLC,* No. 13-CV-6266, 2014 WL 67235
     (S.D.N.Y. Jan. 8, 2014) ..................................................................................................20

*Ethelberth v. Choice Sec. Co.,* 91 F. Supp. 3d 339 (E.D.N.Y. 2015) ...........................................15

*Gamble v. Boyd Gaming Corp.,* No. 2:13-CV 1009, 2015 WL 4874276
     (D. Nev. Aug. 13, 2018) ............................................................................................9, 20

*Gambrell v. Weber Carpet, Inc.,* No. 10-2131. 2012 WL 5306273 (D. Kan. Oct. 29, 2012) .......12

*Gaspar v. Pers. Touch Moving, Inc.,* No. 13-cv-8187, 2015 WL 7871036
     (S.D.N.Y. Dec. 3, 2015)..................................................................................................14

*Jefferson v. MEC Dev., LLC,* No. 1:17-CV-1394, 2019 WL 17626 (E.D. Cal. Jan. 11, 2019)14, 17

*Persaud v. D & H Ladies Apparel LLC,* No. 16-cv-5994, 2017 WL 1944154
     (S.D.N.Y. May 8, 2017)..................................................................................................14

*Van Buren v. Health Alliance Plan of Michigan,* No. 17-11336, 2019 WL 670203
     (E.D. Mich. Feb. 19, 2019) ............................................................................................13

*Viceral v. Mistras Group, Inc.,* No. 15-CV-02198, 2016 WL 5907869
     (N.D. Cal. Oct. 11, 2016)...............................................................................................20


Statutes and Codes

29 C.F.R. § 785.39 .........................................................................................................................2

29 U.S.C. § 216(b) .......................................................................................................................17

Fair Labor Standards Act (FLSA).................................................................................................17

## INTRODUCTION

Proposed Intervenor Timothy Borup ("Borup") respectfully submits these Objections to the Plaintiff's Motion for Approval of an FLSA Settlement (Dkt. 51). A hearing on Proposed Intervenor's Motion to Intervene and Transfer (Dkt. 38) has been set for March 21, 2019. Dkt. 43.

The proposed settlement was filed after Borup filed his Motion to Intervene. To allow full consideration of the issues implicated by the Motion to Intervene, Borup respectfully requests the Court consider these Objections to the proposed settlement, which also provide important information in support of his intervention motion.

The proposed nuisance value settlement here provides putative collective action members with approximately 10% of their FLSA damages. The proposed settlement was achieved only *after* Proposed Intervenor Borup's counsel in the first-filed action rejected similar nuisance value offers, and then appropriately demanded fair value for the FLSA claimants. The proposed settlement here is also far below the court-approved settlement values for HCI ATE workers in other cases.

Under all applicable standards, the proposed settlement must be rejected. The fair value of the claims at issue is several multiples above the proposed settlement here. This lawsuit should be transferred to the District of Minnesota under the first-to-file rule.

## FACTS

A.    *The ATE Workers – Hours Worked And Pay Received*

At-the-elbow ("ATE") workers were recruited by HCI from communities throughout the United States to travel to different locations for "go live" events. A "go live" event, as referred to in this brief, was the process by which a hospital or medical facility changed from one

commercial software program to another commercial software program.  The ATE workers were identified by HCI recruiters through social media postings on LinkedIn, Facebook, and Indeed. Ex. A, Carew Depo., at 113:24-116:1. [1]

The ATE workers taught users (the hospital employees) how to use the new software program.  Ex. R, ¶¶ 5, 9.  HCI described the job duties for ATE workers as providing "cheerful and encouraging support" to new Epic software users on how to navigate the software.[2]  Ex. A, Carew Depo., at 225:16-25.  The ATE workers were generally scheduled by HCI to work 12-hour shifts on consecutive days, including weekends, for a period of one to three weeks.  The ATE workers would be paid on an hourly basis, "straight time,"[3] generally in the range of $36 to $45 per hour.  *Id.* at 179:5-10; 212:13-18.

Because ATE workers did not reside in the same hometown as the "go live" venues, HCI would arrange for and schedule their out-of-town travel through an entity that was jointly owned by HCI ownership, called Global Business Travel.  *Id.* at 111:10-25.   Because the ATE workers were scheduled to work 12-hour shifts, this out-of-town travel generally took place during "normal business hours,"[4] on the day immediately preceding and the day following the "go live" event.

The ATE workers were required to record their "hours worked" in a software app on their cell phones called "Deputy," but only for hours worked in the healthcare facility itself.  *Id.* at

---

[1] "Ex. ___" refers to the exhibits attached to the Declaration of T. Joseph Snodgrass Filed in Support of Proposed Intervenor Borup's Reply Memorandum in Support of Motion to Intervene and Transfer (hereinafter "Snodgrass Decl.") (Dkt. 57), which is filed concurrently herewith.

[2] Epic software is a widely available commercial software product used in most medical facilities in the United States.  *See* https://www.beckershospitalreview.com/ehrs/all-of-us-news-top-20-hospitals-use-epic.html (last visited Mar. 11, 2019) (noting that 20 of the largest hospitals in the United States use Epic).

[3] "Straight time" means that the same hourly rate would be paid regardless of whether the worker exceeded 40 hours in a given workweek.

[4] *See generally* 29 C.F.R. § 785.39 (Travel away from home community).

82:9-23.  The ATE workers were not paid for out-of-town travel, which was a decision made by senior leadership many years ago.  *Id.* at 91:22-92:9.

The ATE workers' overtime claim, therefore, has two components: (1) the unpaid half-time premium for recorded hours over 40 per workweek already paid at a straight time hourly rate; and (2) the unrecorded out-of-town travel hours (during workweeks in which the unrecorded travel time plus the recorded time exceeded 40 hours per workweek) at the full overtime rate.

To illustrate the FLSA damages for a given putative collective action member, the following illustration may assist the Court.  Assume that an ATE worker spent 5 hours travelling by airplane and/or automobile on a Wednesday morning[5] from her home community to a city in which a "go live" event was to start the following day (Thursday).  She then worked 10 straight days, 12 hours per day, from 6 a.m. to 6 p.m.  The following morning (a Sunday), she then spent 5 hours travelling back to her home community.

HCI paid this ATE worker $5,400, simply calculated by multiplying her recorded straight time hours (10 days @ 12 hours per day = 120 hours) by her $45 hourly rate.  Under the FLSA, however, this ATE worker should have been paid an additional $1,575 – $1,057.50 for the first workweek and $517.50 for the second workweek.  Specifically, the ATE worker worked 77 hours (5 unrecorded out-of-town travel hours plus 72 recorded hours) during the first workweek (Wednesday through Tuesday), and 53 hours (5 unrecorded travel hours plus 48 recorded hours) during the second workweek (Wednesday through Sunday).

Her unpaid overtime is properly calculated as follows:

---

[5] HCI's FLSA workweek ran from Wednesday 12:00 a.m. to Tuesday 11:59 p.m.  Ex. A, Carew Depo., at 156:5-158:9.

<u>First workweek</u>: $1,057.50

- 77 total hours worked (5 unrecorded out-of-town travel hours plus 72 recorded hours)

- 32 recorded hours over 40 hours at half-time (32 x $22.50 = $720); plus

- 5 hours of unrecorded travel time (5 x $67.50 = $337.50).

<u>Second workweek</u>: $517.50

- 53 total hours worked (5 unrecorded out-of-town travel hours plus 48 recorded hours)

- 8 recorded hours over 40 hours at half-time (8 x $22.50 = $180); plus

- 5 hours of unrecorded travel time (5 x $67.50 = $337.50).

**B.     The Proposed Settlement Provides Workers With Approximately 10% Of The Value Of Their Unpaid FLSA Claim**

Under the proposed settlement here, instead of $1,575, the ATE worker in the above illustration will receive only $159.93 or approximately 10% of the FLSA claim value.  The ATE worker in the above illustration spent 10 days as an ATE and two days travelling.  Generally, an ATE worker will receive slightly more than 10% of the value of her claim under the settlement if she worked more days between out-of-town travel, and she will receive slightly less than 10% if she worked fewer days.  Of course, substantially longer or delayed air or bus travel could drive the ATE workers' settlement recovery substantially below 10%.

There is no dispute that the ATE workers will receive only 17.77% of the value of their recorded hours and 0% of the value of their travel time under the proposed settlement.  While there is very little objective data provided to the Court, the following data is disclosed:

- $306,625[6]  will be made available to 531 eligible workers;[7]

---

[6] This number is derived from the gross payment ($500,000) less the proposed attorneys' fees ($165,000), less the proposed costs and disbursements ($7,000), less Ms. Gray's proposed incentive award ($10,000) and the proposed administrative costs ($11,375).

4

- The workers' unpaid, *recorded* FLSA overtime claim value is $1,725,200[8] (Dkt. 52, ¶ 12) ;

- The settlement provides just 17.77% of the value of the *recorded* hours claim ($360,625 / $1,725,200);

- The settlement provides $0 for the workers' *unrecorded* out-of-town travel hours claim;

- As the above illustration demonstrates, the proposed settlement pays workers approximately 10% of the FLSA damages at issue ($159.93 / $1,575).

## C.    Chronology Of The Settlement Negotiations In *Borup v. HCI*

On June 13, 2018, the Borup lawsuit was filed.

On July 30, 2018, HCI requested a 61-day stay of litigation to engage in settlement discussions. Ex. B.

On August 6, 2018, Borup's counsel confirmed that settlement negotiations had to include all independent contractors, excluding only persons "who deposited settlement award checks" due to the *Sanders* settlement. Ex. C.

On August 13, 2018, HCI confirmed that settlement negotiations and exchange of information would concern "all ATEs who have not released claims, and who were classified and paid as independent contractors at any time during the three years prior to June 13, 2018." Ex. D.

On August 15, 2018, the parties signed a non-disclosure agreement concerning the information to be produced.  Ex. E.

On September 17, 2018, the parties agreed: (1) to a tolling agreement that ran from September 1, 2018 to November 28, 2018; and (2) to start a "phone call" mediation process with

---

[7] This number is questionable, as HCI's counsel identified 755 eligible workers in negotiations with Borup's counsel.  Ex. N.

[8] This number is derived from multiplying the figure in the Stephans Declaration (Dkt. 52), paragraph 12, by two.

John Phillips of Husch Blackwell in Kansas City, leading only to an in-person mediation if significant progress was made. Ex. F and G.

On September 19, 2018, the parties had started the mediation process with Mediator Phillips, and sent him extensive pleadings and documents from the *Sanders* litigation. Ex. H.

On September 28, 2018, HCI's counsel indicated they were close to producing "the list of those from *Sanders* that did not opt-in and are working on getting the data from Seyfarth on their workweeks and the SOL." Ex. I.

On October 8, 2018, HCI indicated that it was "working with the attorneys from Seyfarth," but was having trouble producing the data from the ATEs who did not participate in the *Sanders* settlement. Ex. J.

On October 30, 2018, Borup's counsel notified Mediator Phillips and defense counsel of his disappointment with the pace of the mediation process. Ex. K.

On November 5, 2018, Borup's counsel advised Mediator Phillips that he would recommend settlement to the district court for 100% of the outstanding FLSA damages including 100% of the outstanding travel time and liquidated damages, with attorneys' fees, costs, claims administration and service awards to be negotiated only after the amount to the class had been determined. Borup's counsel stated:

> This e-mail follows our discussion and your request that a settlement demand be advanced.
>
> As I have advised you and defense counsel, I cannot and will not be able to make a lump sum offer given the absence of weekly wage and hour data produced. Nevertheless, I can provide you with a formula-based settlement demand. Because this is both a class and collective action, I believe it appropriate not to negotiate attorneys' fees and costs prior to negotiations for the putative class and opt-ins.

> This offer fully contemplates inclusion of all eligible opt-ins including the employees that chose not to participate nor release their FLSA claims in prior lawsuits.
>
> We would settle for the unpaid overtime, liquidated, and inclusive of travel time. For travel time, we would use three hours on the front end and back end of assignments, but only if the travel time resulted in a workweek over 40 hours. To the benefit of HCI, we contemplate a claims made settlement program.

Ex. L.

On November 13, 2018, HCI made an offer to pay all ATEs the same amount, $213.75, (calculated as $22.50 hourly rate times 9.5 hours), no matter how many hundreds of hours were at issue for a given employee. Ex. M.

On November 13, 2018, Borup's counsel advised Mediator Phillips that they would not respond to HCI's nuisance value settlement offer. Snodgrass Decl. ¶ 3.

On November 19, 2018, *HCI increased its formula offer to 12.5% of the FLSA damages owed on just the recorded hours worked, 0% on the unrecorded travel time hours ("We have not factored in travel time at this point in the discussion.") and $30,000 in attorneys' fees to be paid separately*. Ex. N (emphasis added).[9]

In communicating the 12.5% offer for recorded hours, Mediator Phillips stated that he was "confident" that HCI would be willing to pay "far" more. Phillips also stated that HCI understood it had serious liability for liquidated damages. Phillips also stated that he did *not* think that HCI would move enough to make an in-person mediation then scheduled for November 28, 2018 worth the effort. *Id.* In conveying HCI's offer, Phillips stated that HCI would eventually and dramatically increase the offer, including the addition of liquidated damages, which HCI realized it would have to pay:

---

[9] The 12.5% offer for all recorded hours is equal to 20% of the unliquidated hours at issue plus 5% of liquidated damages (25% / 2) reflected in the settlement e-mail.

> I am confident that they view this as incremental bargaining and that they are far
> from where they will eventually get.  The liquidated is pretty straightforward and
> she knows that so she is going really slow on that.

*Id.*

Borup again rejected the 12.5% offer as an unreasonable nuisance value offer.  Then, at

HCI counsel's request, Borup's counsel made a "take it or leave it" demand to HCI.  Borup's

counsel divided the unpaid overtime hours at issue into three categories and demanded the

following to resolve the claims:

- 90% of all FLSA damages (including 90% travel time hours and 90% of
  liquidated damages) for unpaid overtime hours incurred after the *Sanders*
  settlement.  The basis for this demarcation was the egregiousness of not paying
  overtime to ATE workers after the *Sanders* settlement;

- 67.5% of all FLSA damages (including 67.5% travel time hours and 67.5% of
  liquidated damages) for unpaid overtime hours incurred before the *Sanders*
  settlement; and

- 50% of all FLSA damages (including 50% travel time hours and 50% of
  liquidated damages) for unpaid overtime hours incurred between two and three
  years before opt-in.  The basis for this demarcation was the difference in FLSA
  statute of limitations for two versus three years.

HCI's counsel informed Borup's counsel that the foregoing demand was too high, and

negotiations ended.  Snodgrass Dec., ¶ 4.

Obviously, the settlement ultimately accepted by Gray's counsel was far below that

which could have been negotiated by Borup's counsel, as reflected in the November 19, 2018

written comments from Mediator Phillips.   Ex. N.

**D.**    **The *Gray* Proposed Settlement Increased The Nuisance Value Claim Rejected By
        The Workers In *Borup* By 3%, Obtains No Travel Time Or Liquidated Damages,
        But Increases HCI's Offer For Attorneys' Fees And Costs By 5.7 Fold**

A simple comparison of the settlement proposal rejected by Borup as nuisance value, and

the settlement accepted Gray's counsel, reveals that the only substantive difference was a large

payment of attorneys' fees. As reflected in section I.B., *supra*, under the proposed settlement in *Gray*, instead of $1,575, the ATE worker in the illustration will receive only $159.93 – or approximately 10.1% of the FLSA claim value (17.7% of the $900 in recorded unpaid overtime hours and 0% of the unrecorded travel hours). Under the settlement proposal rejected as a nuisance value offer in *Borup*, (Ex. N), the same ATE worker would receive $112.50—or approximately 7.1% of the FLSA claim value (12.5% of the $900 in recorded unpaid overtime hours and 0% of the unrecorded travel hours).

As a result, after two days of formal mediation, Gray's counsel was able to increase the nuisance value settlement offer rejected out-of-hand by the workers in Borup by a mere 3%. At the same time, Gray's counsel increased the proposed attorneys' fees and costs offered by HCI in *Borup* from $30,000[10] to $172,000 – a 5.7 fold improvement.

Because Borup's mediator stated in an e-mail that the 12.5% nuisance value offer was only an "incremental offer" that would be dramatically increased, it is clear that Gray's counsel simply accepted the nuisance value offer in *Borup* and primarily focused on negotiating a 5.7 fold increase in their own attorneys' fees and costs.

## E.    The Proposed *Gray* Settlement Is Far Below The Value Of The *Sanders* Settlement

The *Borup* mediator's statement that HCI would pay "far more" than that accepted here is consistent with HCI's other ATE worker settlements. Specifically, the settlement arising from *Sanders et al. v. The CJS Solutions Group, LLC*, Case No. 17-3809 (S.D.N.Y.), involved the same category of worker against the same Defendant. The *Sanders* settlement provided, after payment of all attorneys' fees, costs, claims administration and incentive awards, 49% of the

---

[10] Again, HCI's fees and costs offer was not solicited by Borup. Borup's counsel followed general ethical standards and their deferred fee and costs negotiations concerning relief to the collective before negotiating fees to counsel. Ex. L; *see Gamble v. Boyd Gaming Corp.*, No. 2:13-CV 1009, 2015 WL 4874276, at *9 (D. Nev. Aug. 13, 2015) ("The amount of attorneys' fees and costs allocated in an FLSA settlement should, therefore, be separately reached and without regard to the settlement amount paid to plaintiffs.").

value of the FLSA claim for recorded hours. Ex. O, ¶ 22 ("Importantly, after deducting … service awards … attorneys' fees …costs incurred by Class Counsel … the Net Settlement Fund … represents approximately 98% of the unliquidated damages.").

While the FLSA settlement in *Sanders* did *not* pay any amounts for unrecorded out-of-town travel hours incurred by the ATE workers (the Court was not apprised of this claim at the time of settlement), no explanation is given by settling counsel here why they failed to at least achieve as good a settlement for the workers as in *Sanders*. The workers in the proposed *Gray* settlement will receive just 36% of the amount obtained by the workers under the *Sanders* settlement (17.7% of the FLSA damages for recorded hours versus 49% of the FLSA damages for recorded hours). The *Sanders* settlement proves the unreasonableness of the proposed settlement.

## F. The Proposed *Gray* Settlement Is Far Below The Value Of The *McFarlane* Settlement

The value of the proposed *Gray* settlement is also several multiples below the value of the ATE worker settlement in *McFarlane v. The CJS Solutions Group, LLC*, Case No. 1:17-CV-07081 (E.D.N.Y.). In *McFarlane*, HCI's ATE worker received $14,881 net of attorneys' fees against a full liquidated FLSA claim of $21,087.25. Ex. P. The ATE worker, therefore, obtained at least 64% of this claimed FLSA damages, fully liquidated. The Magistrate's order approving the FLSA settlement stated:

> In reaching this conclusion, I have considered, among other things, (1) that the settlement amount provides plaintiff *with a recovery, net of attorney's fees, greater than the amount of wages he claimed are due.* In this regard, I point out that, as indicated on page 2 of plaintiff's letter, the wages owed were paid by defendant during the litigation, and the settlement amount therefore reflects a compromise only of plaintiff's claims for liquidated damages and attorney's fees… I therefore respectfully recommend the settlement be approved.

Ex. Q (emphasis added). The district court accepted the Magistrate's recommendations on July 6, 2018. *Id.*

Again, no information is provided by the settling parties here why HCI should not pay full wages owed plus a large percentage of liquidated damages – when the employer clearly demonstrated its willingness and need to do so a few months earlier.

## ARGUMENT

### A.     Standard Of Review

The FLSA is a uniquely protective statute, and the district court is required to conduct its own analysis of a proposed FLSA settlement, even when the employees are represented by counsel. *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 205 (2d Cir. 2015). Even when represented by counsel, employees "may be more inclined to accept private settlements *that ultimately are cheaper to the employer than compliance with the Act*." *Id.* (emphasis added). A federal court cannot accept an FLSA settlement simply because the settling employee's counsel says so. *Cabrera v. CBS Corp.*, No. 17-CV-6011, 2019 WL 502131, at *5 (S.D.N.Y. Feb. 8, 2019).

The proposed settlement in the aggregate (*i.e.*, inclusive of back wages, plaintiffs attorneys' fees, costs, claims administration and the incentive award to Ms. Gray) provides far less than 50% of the *unliquidated* value of the recorded and unrecorded hours at issue. As a result, if this settlement is approved, HCI would profit from its repeated, widespread, and continuing violation of the FLSA. The only lesson this settlement will teach is that it pays not to comply with the Act.

In light of these factors, a court considering approval of an FLSA settlement generally considers: "(1) whether the proposed settlement was fairly and honestly negotiated; (2) whether

serious questions of law and fact exist which place the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable." *Gambrell v. Weber Carpet, Inc.*, No. 10-2131, 2012 WL 5306273, at *4 (D. Kan. Oct. 29, 2012).

## B. The Proposed Settlement Was Not Fairly And Honestly Negotiated

The undisputed facts plainly demonstrate that a reverse auction took place and that the settlement was designed primarily to avoid having workers opt-in to *Borup* (where they would not settle for nuisance value) in exchange for a healthy payment of attorneys' fees and costs.

First, the 10% settlement value to workers is grossly unfair and improper by any measurement. In *Borup*, HCI offered a nuisance value settlement to Borup's counsel for approximately 7% of the total hours at issue, and $30,000 in attorneys' fees and costs. Ex. N. The *Borup* mediator stated in writing that this nuisance value settlement was "far from where they will eventually get." *Id.* The mediator stated that HCI understood it was liable for liquidated damages. *Id.* Borup rejected the nuisance value proposal out-of-hand.

Gray's counsel then accepted a nearly identical nuisance value settlement for ATE workers of approximately 10% of the total hours at issue – an increase of just 3%. Instead of any meaningful increase in value to the ATE workers, HCI paid Gray's counsel $172,000 in attorneys' fees and costs – a 5.7 fold increase of the unsolicited offer for fees and costs provided by HCI in *Borup*.

Just as importantly, the proposed settlement seeks to directly pay the ATE workers 10% of their claim by sending a check with a printed release. The ATE workers will be provided no notification to learn about the active *Borup* litigation and no warning that the settlement here is

far below other court-approved FLSA settlements received by their co-workers. The ATE workers are simply provided an opportunity to cash the nuisance value settlement and simultaneously release all of their claims.

In the opinion of Borup's counsel, the collective's claims were compromised for attorneys' fees. If the case had settled in *Borup*, Gray's attorneys would be limited to attorneys' fees arising out of an individual lawsuit, one in which they had neither filed a single contested motion nor taken any discovery. To obtain a recovery of fees, Gray's attorneys were leveraged into a horrible settlement by an opportunistic defendant.

Further, it is likely the generous service award resulted in the proposed settlement. While the settlement proposes Ms. Gray receive a $10,000 incentive award, there is nothing to suggest Ms. Gray provided a deposition or responded to any written discovery. Would Ms. Gray settle her own claim absent her proposed service award? Would she have agreed to settle her own claim for nuisance value even if she knew how much other ATE workers received in the other FLSA settlements? These questions are left unanswered.

## C. Gray Has Not Offered Any Information Or Evidence Concerning The Disputed Claims And Defenses

### 1. The Absence Of Information Concerning The Back Wages Claim

The Court's obligation in reviewing settlements of FLSA claims is to ensure that the parties are not, *via* settlement of the claims, negotiating around the clear FLSA requirements of compensation for all hours worked and overtime. *Van Buren v. Health Alliance Plan of Michigan*, No. 17-11336, 2019 WL 670203, at *1 (E.D. Mich. Feb. 19, 2019).

In order to make this analysis, the Court needs *evidence* about the number of hours for each claimant, information regarding the potential range of recovery of each plaintiff, and the

factual basis for the claims and defenses supported by evidence. Absent this information and evidence, the Court cannot properly analyze a proposed FLSA settlement:

> Without evidence, meaningful explanation, and calculations about Plaintiffs' reasonable range of recovery – including the factual and evidentiary basis for Plaintiffs' alleged unpaid overtime – as well as the proposed settlement amounts' departure from the maximum possible recovery, the Court cannot determine the fairness and reasonableness of the proposed settlement amounts. The Court will not rely on unsupported and conclusory assertions from the parties' counsel.

*Jefferson v. MEC Dev., LLC*, No. 1:17-CV-1394, 2019 WL 17626, at *4-5 (E.D. Cal. Jan. 11, 2019).

"[T]he parties must provide the court with enough information to evaluate the *bona fides* of the dispute." *Gaspar v. Pers. Touch Moving, Inc*., No. 13-cv-8187, 2015 WL 7871036, at *1 (S.D.N.Y. Dec. 3, 2015); *see also Persaud v. D & H Ladies Apparel LLC*, No. 16-cv-5994, 2017 WL 1944154, at *1 (S.D.N.Y. May 8, 2017) (quoting *Run Guo Zhang v. Lin Kumo Japanese Rest. Inc*., No. 13-cv-6667, 2015 WL 5122530, at *1 (S.D.N.Y. Aug. 31, 2015)) (refusing to approve FLSA settlement where "the parties have 'failed to provide the Court with enough information about the bona fides of the dispute to determine whether the settlement amount was fair and reasonable'").

Here, the parties have provided the Court with no actual information or evidence concerning the *bona fides* of the dispute. First, there is no information to allow this Court to know what Ms. Gray actually did, much less whether she engaged in the same work under the same condition as other workers. Nor is any information provided to value her individual claim.

Without this most basic information, this Court cannot determine whether Gray is a fair representative. The parties do not even describe—much less with evidentiary support—the job duties of Ms. Gray or any other collective action members. What did Ms. Gray do? Did the

other workers in the proposed settlement engage in the same work under the same conditions? For example, did these workers all sign similar contracts? The Court is left guessing.

### 2. Absence Of Information Concerning The Seminal Independent Contractor Issue

Significantly, there is no information or evidence concerning the seminal claim – that Ms. Gray and the proposed collective action members were employees rather than independent contractors. Why does Ms. Gray contend workers were improperly classified as independent contractors? What is the evidentiary support for this claim? Is there any evidentiary support to rebut this claim? If so, what is the employer's evidence? What are the employees' chances of prevailing?

In Borup's opinion, this legal issue cannot plausibly be a basis to enter into a nuisance value settlement, and it is even questionable whether the issue presents a *bona fide* dispute when the true facts are disclosed. There is little to no risk of an adverse jury determination on this issue, because the ultimate determination of whether an ATE worker is an independent contractor or an employee is a question of law. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 350 (E.D.N.Y. 2015).

The factors considered by federal courts for this analysis, as applied to the facts that HCI will not contest (many of which are contained in contracts and written instructions), hardly allow room for debate. HCI paid the ATE workers a fixed hourly rate. HCI unilaterally set the workers' schedules, generally at 12 hours per day consecutively. HCI required the workers to log their hours in HCI's own time-keeping system. HCI controlled the ATE workers' work attire. HCI controlled their work location and job duties. HCI controlled their housing. HCI controlled their travel. HCI did not require any equipment investment by the workers. HCI controlled the firing of the workers. HCI prohibited the workers from seeking an employment

relationship with the hospital facilities. The ATE workers did not interact with HCI controlling management. These are only some of the facts that are not disputed.

In short, while HCI and the plaintiff's lawyers may correctly claim that HCI currently disputes (for settlement purposes) the independent contractor classification issue, no factual support or analysis for why this issue would warrant even a minimal discount from the FLSA claims of workers is provided in the moving papers. It would be unrealistic to significantly discount the workers' FLSA claims based upon the facts at issue when finally disclosed to the Court by the settling parties.

### 3. Absence Of Information Concerning Overtime Exemptions

Similarly, because the workers' job duties are not disclosed, it is literally impossible for the Court to weigh the strengths and weaknesses of any alleged affirmative defenses based upon alleged FLSA overtime exemptions. If the workers are employees, what exemptions are alleged to apply? What are the requirements for these exemptions, and does the employer have any reasonable evidentiary support for satisfaction of each requirement? If so, what is the employees' evidence? Again, nothing is provided.

### 4. Absence Of Information Concerning Statute Of Limitations

While Gray's attorneys raise the issue of FLSA statute of limitations, which can be as long as three years (upon proof of an employer's bad faith), it is impossible to analyze this defense because no information or evidence is provided. How many workers even have overtime hours between three years and two years? Were the employees' claims for unpaid hours within three years treated the same as a different employee's claims for unpaid hours within two years? If so, why? Again, no explanation is provided.

### 5. *Absence Of Information Concerning Hours Worked*

There is no information provided concerning any individual's hours – including the proposed representative. Further, nothing is even mentioned concerning the unrecorded hours at issue. For example, did Ms. Gray or any of the workers engage in off-the-clock work, such as out-of-town travel? How many hours are at issue for this portion of the claim? How was this claim valued in settlement? Again, no information is provided.

### 6. *The Absence Of Information Concerning Liquidated Damages*

Finally, the Court separately needs evidence concerning the mandatory liquidated damages claim to be settled. Upon a violation of the FLSA, the Act *mandates* payment of liquidated damages. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of section 206 or section 207 of this title *shall* be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages*.") (emphasis added).

In order to escape paying some or all of the statutory liquidated damages, employers may seek to establish a good faith defense, but to do so they bear the burden of showing that they acted with both objective and subjective good faith in their violation of the FLSA. This evidence must be presented to the district court if liquidated damages are to be reduced or discounted. *Jefferson*, 2019 WL 17626, at *5.

Consistent with the conclusion of the *Borup* mediator, the limited discovery undertaken in *Borup* to date demonstrates that HCI did not act in good faith when it came to overtime obligations generally and the payment of ATE workers specifically. For background, the ATE workers began to question HCI recruiters about the failure to pay overtime at least as far back as

2015.  Ex. A, Carew Depo., at 120:7-13.  However, HCI recruiters did not document complaints received about wage and hour issues.  *Id.* at 122:2-4.

In 2016, HCI knew that it was underpaying ATE workers after a competitor lost a similar lawsuit.  *Id.* at 54:11-25.  Nevertheless, HCI continued to refuse to pay overtime.  The motivation for HCI's conduct is pretty plain.  HCI's then-owner and current CEO, Ricky Caplin, owned equity of over 30% of HCI when it was acquired in 2017 for $110 million by Tech Mahindra.  *Id.* at 187:2-6.  Despite his wealth, it was common knowledge that Mr. Caplin is "cheap."  *Id.* at 187:18-25.

For example, to assist in recruiting workers for a project, HCI recruiters promised the ATE workers that, if they worked several projects, they would become eligible for a raffle between five and ten thousand dollars.  After this money was promised to ATE workers to entice them to accept work, HCI's CEO simply shut down the raffle without paying any ATE worker or telling them they were being cheated.  He kept the money because "he didn't want to give away thousands of dollars."  *Id.* at 130:22-131:7; 133:4-134:20.[11]

This was not the only lie told by recruiters of ATE workers.  For another example, HCI recruiters testified that certain ATE workers were promised that they would receive a higher rate of pay in 2018 if they worked certain projects.  *Id.* at 197:18-198:20; 203:18-21.  HCI knew that the promise was false when it sent the information to try to recruit workers.  *Id*.  For another example, recruiters tried to talk ATE workers into taking a salary, instead of continuing to work hourly, for less pay – by falsely insinuating they would receive continuous work from HCI.  *Id.* at 188:1-189:7.

---

[11] Mr. Caplin also promised raises to people and would not follow through.  Ex. A, Carew Depo., at 184:2-16.  Further, Mr. Caplin generally pays less than HCI's competitors.  *Id.* at 182:23-183:14.

The evidence from discovery taken in Borup simply arose from a culture of being cheap and cheating ATE workers. There is no evidence whatsoever provided by the settling parties as to why the liquidated damages claims were compromised in their entirety.

**D.     The Value Of An Immediate Recovery Does Not Outweigh The Mere Possibility Of Protracted Litigation**

Given that the settlement proposes to pay only 10% of the value of the FLSA claims, it is difficult to justify a compromise based upon the time value of money. The current Federal Reserve benchmark interest rate is 2.25-2.5%.

If settlement is rejected here, one would expect a better settlement to be achieved in the near future – several multiples of what is being accepted here – based upon the Defendant's settlement practices in other ATE worker overtime litigation. But even if the litigation was protracted, final resolution could reasonably be expected in 24 months. If the Court considers the fair value of the claims to be as strong as Borup's counsel believes, the employees will more likely than not receive several multiples of the recovery being offered here. While it is conceivable employees can do worse (because no attorney can ethically guarantee results in litigation), by all accounts and measurements the reasonable and fair value of the claims at issue far exceeds the current proposed value even accounting for the lost time value of money.

**E.     The Proposed Attorneys' Fees And Costs Are Not Supported Or Appropriate**

The proposed settlement provides a disproportionate share of recovery to the attorneys and proposed collective action representative, and provides no information as to how the attorneys' fees amount was arrived at. No timesheets have been provided.

In reaching an FLSA settlement, courts generally state that fees and costs should be negotiated separately and after relief to the collective is negotiated:

> The FLSA provides for settlement agreements to include an award of reasonable fees. In the context of a collective action, a court must determine the reasonableness of attorneys' fees to minimize conflicts that may arise between the plaintiffs and their counsel. A district court must be sure that the settlement agreement and release has not been tainted by any conflict of interest regarding the agreed upon attorneys' fees. *The amount of attorneys' fees and costs allocated in an FLSA settlement should, therefore, be separately reached and without regard to the settlement amount paid to plaintiffs.*

*Gamble*, 2015 WL 4874276, at *9 (emphasis added / citations omitted).

Here, it is not clear when the *Gray* attorneys negotiated their fees and costs – before or after the time period when the modest 10% relief to the collective was obtained. No information is provided concerning the tasks undertaken by the attorneys justifying the award, and no formal discovery or motion practice was undertaken prior to settlement. The only documentation referenced as being reviewed for the settlement was simple spreadsheets of hours worked for the ATE workers. But this same information was already produced and reviewed by counsel in *Sanders*.

If the settlement is approved, which it should not be, the attorneys' fees should be dramatically reduced due to the early settlement and poor result. Where the parties reach a tentative settlement shortly after the filing of the action, a reduction of the attorneys' fee award is appropriate. *Cisneros v. Schnipper Rest. LLC*, No. 13-CV-6266, 2104 WL 67235 (S.D.N.Y. Jan. 8, 2014). Where an FLSA settlement provides a generous recovery for counsel despite extremely limited success, attorneys' fees should also be reduced. *Viceral v. Mistras Group, Inc.*, No. 15-CV-02198, 2016 WL 5907869, at *9 (N.D. Cal. Oct. 11, 2016). If settlement is approved over the objection of Borup, which it should not be, the Court should at the least dramatically reduce the fees and costs to allow a greater recovery for the ATE workers.

## **CONCLUSION**

For the foregoing reasons, the proposed settlement should be rejected and the case transferred to the District of Minnesota.

Dated:  March 14, 2019

**LARSON • KING, LLP**

By *s/T. Joseph Snodgrass*
Daniel C. Adams (NY#2815371)
T. Joseph Snodgrass (admitted *pro hac vice*)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
(651) 312-6500 Phone
(651) 312-6618 Fax
dadams@larsonking.com
jsnodgrass@larsonking.com

**Attorneys for Timothy Borup,
Proposed Intervenor**

1832999

21