# EXHIBIT E

J49KGRAM                    TELEPHONE CONFERENCE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SHANA GRAY,

                    Plaintiff,

            v.                        18 CV 7336 (GHW)

THE CJS SOLUTIONS GROUP LLC,

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      April 9, 2019
                                      4:50 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                      District Judge

                         APPEARANCES

STEPHAN ZOURAS LLP
      Attorneys for Plaintiff
BY:  CATHERINE T. MITCHELL
      RYAN F. STEPHAN

SEYFARTH SHAW LLP
      Attorneys for Defendant
BY:  CHRISTINA DUSZLAK
      GENA BROOK USENHEIMER
      -AND-
LITTLER MENDELSON PC
BY:  JACQUELINE E. KALK

LARSON KING LLP
      Attorneys for Intervenor Timothy Borup
BY:  JOSEPH SNODGRASS

1          (In chambers; parties present telephonically)

2          THE COURT:  This is Judge Woods.  Do I have counsel

3     for plaintiff on the line?

4          MR. STEPHAN:  Good afternoon, your Honor.  You have

5     Ryan Stephan and Catie Mitchell, on behalf of the Gray

6     plaintiffs.

7          THE COURT:  Good.  Thank you.

8          Do I have counsel for defendant on the line?

9          MS. USENHEIMER:  Yes.  This is Gena Usenheimer and

10    Christina Duszlak, for HCI, at Seyfarth Shaw.

11         MS. KALK:  Also Jackie Kalk, from Littler, on behalf

12    of defendants.

13         THE COURT:  Thank you very much.

14         Do I have counsel for intervenor Mr. Borup on the

15    line?

16         MR. SNODGRASS:  Yes.  Good afternoon, your Honor.

17    This is Joe Snodgrass, on behalf of Tim Borup.

18         THE COURT:  Good.  Thank you, all.

19         As you know, we are here to discuss the putative

20    intervenor Mr. Borup's motion to intervene and to transfer this

21    case to the District of Minnesota.  I've reviewed the parties'

22    submissions and the arguments presented during our April 5

23    conference and carefully considered those issues.  Still, if

24    any party would like to provide me with any additional

25    information or argument in support of your respective

1    positions, I will invite you to do so now.

2            First, counsel for Mr. Borup, anything that you'd like

3    to add?

4            MR. SNODGRASS:  No, your Honor.

5            THE COURT:  Thank you.

6            Counsel for plaintiff in the Gray matter?

7            MR. STEPHAN:  Just briefly, your Honor.  I'm not sure

8    that this was addressed during our call last Friday, but we do

9    believe that the classes at issue, the plaintiffs are

10   different.  We thought it was important to point that out.  In

11   our case, we've clearly defined the case as at-the-elbow

12   support.  It's a limited group of 1099 workers.  Our class

13   period would go from August 2015 to May of 2017.  We have

14   approximately 500 people in that class.  We only brought FLSA

15   opt-in claims.

16           The Borup case, on the other hand, has defined the

17   class as all individuals classified as independent contractors.

18   That could be at-the-elbow, Epic Activation Consultants, or

19   others.  My understanding is that the lead plaintiff in that

20   case worked there outside of our class period of May of 2018.

21   My understanding is that there is approximately 100 class

22   members, and in that case, he has both -- Mr. Snodgrass has

23   both FLSA opt-in and also Rule 23 opt-out claims.

24           So we just want to make sure the Court didn't get hung

25   up that we're just looking at this as a job title only type

1    situation.  We do believe that there are important differences.

2            Secondly, with regards to prejudice, if it wasn't

3    clear already, we believe that the plaintiffs in Gray here have

4    a valid settlement.  By transferring this case, they would

5    suffer prejudice, there would be delay.  Potentially, they

6    would be lumped in with all sorts of other independent

7    contractors, not just a narrow group that we have defined in

8    the Gray case.

9            Finally, I think -- and the parties can correct me if

10   I am wrong -- that the statute of limitations -- the tolling

11   agreement has expired in that case.  To the extent that

12   litigation ensues there, there is a real risk that claims will

13   be lost if the settlement that we have achieved here will not

14   be finalized, and that the plaintiffs in this case here will

15   lose out.

16           THE COURT:  Thank you.

17           You described how it is that your collective is

18   limited.  Is that how your collective allegations are pleaded?

19           MR. STEPHAN:  It is, your Honor.  We talk about

20   at-the-elbow support staff.  That's what these cases are about.

21   And once we got further along in the case and started

22   discussing resolution, we clearly merely addressed only this

23   group based on this time period, in this role only.

24           THE COURT:  Thank you.

25           Is the settlement collective identical to the pleading

1  in the complaint?

2            MR. STEPHAN:  No.

3            THE COURT:  Thank you.

4            It's broader in the complaint?

5            MR. STEPHAN:  It may be a little bit broader in the

6  complaint, but the intent was the same for this group of

7  at-the-elbow consultants, not all independent contractors.

8            THE COURT:  Good.  Thank you.

9            Anything else for counsel for defendant?

10           MS. USENHEIMER:  This is Gena Usenheimer.  I just want

11 to pick up on what Mr. Stephan was saying.  Here, our

12 settlement is FLSA collective claims only, and the

13 settlement -- the proposed settlement is structured in such a

14 way, that the only people who would be impacted by the

15 settlement are individuals who make the affirmative step to

16 cash a settlement check.  So there's no prejudice to anybody

17 who doesn't want to participate in the settlement.  There is no

18 prejudice to Mr. Borup.  He's not even -- even if he were going

19 to receive notice of the settlement, which he's not going to,

20 because he filed outside the collective definition in our case,

21 he would have no prejudice because he could simply elect not to

22 cash his check.

23           THE COURT:  Good.

24           MS. USENHEIMER:  That's all I wanted to add.

25           THE COURT:  Thank you very much.

 1          Counsel for Mr. Borup, do you care to respond, in

 2    particular with respect to the comment regarding the duration

 3    of the tolling agreement?

 4          MR. SNODGRASS:  Yes.  So as it relates to the tolling

 5    agreement, and as it was submitted to this Court, the court in

 6    Minnesota has issued an order, in place right now, tolling the

 7    statute of limitations for everybody, and the judge also said

 8    on the record, and it's also in this Court's record, that he

 9    may extend tolling back beyond even the filing of the Gray

10    case.  In other words, the judge has already indicated that

11    it's possible that we could capture more people, which I'm sure

12    everybody on this call would be in favor of, as getting as many

13    people as possible.

14          As far as the differences between the groupings, the

15    pleadings are identical.  They're both for ATEs.  There was no

16    temporal limit.  In fact, the Gray complaint talks about

17    current ATEs when it was filed in August of 2018.  The attempt

18    to limit, or narrow, or change the pleading in the certified

19    class was done only in the settlement process.  And, further,

20    as far as the job duties themselves, Mr. Borup was the only one

21    that submitted proof saying this is what I do, this is what I

22    did, I was an ATE, and there is no proof whatsoever that

23    anybody that's part of the narrowed settlement is any different

24    than Mr. Borup.

25          So then the last issue was, well, there's no

J49KGRAM                                    TELEPHONE CONFERENCE

1    prejudice -- the defense raised the issue that there's no

2    prejudice to Mr. Borup.  Well, the issue isn't whether or not

3    Mr. Borup himself; the issue is who gets to represent or should

4    represent this collective.  And, certainly, Ms. Gray can settle

5    her own individual claim today.  The question is who should

6    represent them in this case?  And because of a wide variety of

7    reasons, first filed being amongst them, the ability to go back

8    further on the statute of limitations, the issue about strength

9    in numbers, the whole purpose behind a collective is to have

10   strength in numbers, not allow the defendant to divide and

11   conquer, as it's already doing and as demonstrated by the

12   settlement here -- in our opinion, a very weak settlement --

13   these are the reasons why the first-filed rule should be

14   faithfully applied here.  There's a presumption in this circuit

15   that first-to-file rule should apply, and we think this is the

16   classic case for its application.

17              That's all I have, your Honor.

18              THE COURT:  Thank you, counsel.

19              So, counsel, can I ask you to each place your phones

20   on mute, please.  I'm going to rule on Mr. Borup's motion now.

21   I'll let you know after I've completed my oral decision when I

22   invite further comment from the parties.  Until then, please

23   keep your phones on mute.  Upon considering the arguments

24   presented today and in the parties' submissions, I'm prepared

25   to rule on Mr. Borup's motion.  As I will render my decision

1   orally, I ask counsel again to keep your phones on mute while I

2   provide my analysis.

3          For the reasons that follow, I am granting

4   Mr. Borup's -- the motion to intervene, and I'm transferring

5   the case to the District of Minnesota.

6          My analysis proceeds in two parts.  First, I will

7   explain why I'm granting Mr. Borup leave to intervene.  Second,

8   I will discuss why I have decided to transfer this case.  As

9   the parties are well familiar with the essential facts, I will

10  not recite them in detail here.  Rather, to the extent that a

11  particular fact is relevant, I will embed it in my analysis.

12          I.  Intervention:

13          On February 21, 2019, Mr. Borup requested leave to

14  intervene in this case pursuant to Federal Rule of Civil

15  Procedure 24(b), which governs permissive intervention.

16  Mr. Borup does not contend that intervention as a matter of

17  right is at issue here, and so I will consider only the

18  question of permissive intervention.  For the reasons that

19  follow, Mr. Borup is granted leave to intervene in this case.

20          (a)  Standard:

21          Rule 24(b) provides that "on timely motion, the court

22  may permit anyone to intervene who...has a claim or defense

23  that shares with the main action a common question of law or

24  fact."  Federal Rule of Civil Procedure 24(b)(1).  "Permissive

25  intervention is wholly discretionary with the trial court."

1   U.S. Postal Service v. Brennan, 579 F.2d 188, 191 (2d Cir.

2   1978).  Of course, however, in exercising its discretion, a

3   court "must consider whether granting permissive intervention

4   will unduly delay or prejudice the adjudication of the rights

5   of the existing parties."  In re Holocaust Victim Assets

6   Litig., 225 F.3d 191, 202 (2d Cir. 2000)(citation and quotation

7   marks omitted); Federal Rule of Civil Procedure 24(b) of (3).

8          As is apparent from the text of Rule 24(b), "The

9   threshold inquiry" in evaluating a motion for permissive

10  interpleader "is whether the application for intervention is

11  timely.  Among the factors to be considered are:  '(1) how long

12  the applicant had notice of the interest before it made the

13  motion to intervene; (2) prejudice to existing parties

14  resulting from any delay; (3) prejudice to the applicant if the

15  motion is denied; and (4) any unusual circumstances for or

16  against a finding of timeliness.'"  Kamdem-Ouaffo v.

17  PepsiCo, Inc. 314 F.R.D. 130, 134 (S.D.N.Y. 2016)(quoting

18  United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir.

19  1994).  "While courts use these four factors as a guide, the

20  determination of whether a motion to intervene is timely must

21  be evaluated against the totality of the circumstances before

22  the court."  Id. (quotation marks omitted).  "Whether a motion

23  to intervene is 'timely' is [also] driven heavily by an

24  analysis of prejudice:  Whether the parties to the case will be

25  prejudiced by intervention, and were the proposed intervenor

1    will be prejudiced by being kept out of the litigation."

2    Authors Guild 2009 WL 3617732 at *2.

3            Additionally, the purported intervenor must have "a

4    claim or defense that shares with the main action a common

5    question of law or fact."  SEC v. Caledonian Bank Ltd., 317

6    F.R.D 358, 368 (S.D.N.Y. 2016).  The words "claim or defense"

7    were not "read in a technical sense, but only require some

8    interest on the part of the applicant."  Louis Berger

9    Group, Inc. v. State Bank of India, 802 F.Supp.2d 482, 488

10   (S.D.N.Y. 2011)(quotation marks omitted).

11           "Courts applying Rule 24 'must be mindful that each

12   intervention case is highly fact specific and tends to resist

13   comparison to prior cases.'"  Kemdem-Ouaffo, 314 F.R.D at 134

14   (quoting Aristocrat Leisure Ltd v. Deutsche Bank Trust Company

15   Ams., 262 F.R.D 348, 352 (S.D.N.Y. 2009).

16           (b)  Application:

17           As I just articulated, the key inquiries here are (1)

18   timeliness of the intervention; (2) whether the intervention

19   would cause undue prejudice or delay; and (3) whether the Borup

20   litigation involves common questions of law or fact with this

21   case.  As I find all three inquiries favor intervention here, I

22   am granting Mr. Borup leave to intervene pursuant to Federal

23   Rule of Civil Procedure 24(b).  I will take up each issue in

24   turn.

25           1.  Timeliness:

1        Counsel for Mr. Borup has proffered, both here and

2   before the district court in Minnesota, that he did not become

3   aware of this litigation until January 31, 2019.  Borup moved

4   to intervene on February 21, 2019.  The Court does not consider

5   the intervening 21-day period a lengthy or inappropriate delay.

6   Indeed, I do not believe that any party was meaningfully

7   impacted by Borup's filing of his motion on February 21, 2019,

8   rather than on some earlier date between then and the 31st of

9   January.  Indeed, while the motion to intervene may have

10  provided incentive for the parties here to conclude their

11  settlement negotiations more quickly, that can hardly be

12  considered a relevant prejudice.  Accordingly, I find that any

13  delay between January 31, 2019, and February 21, 2019, was not

14  prejudicial.

15       However, under normal circumstances, Borup would have

16  been on constructive notice of this case due to its public

17  filings and docket.  See MasterCard International, Inc. v. Visa

18  International Serv. Association, Inc., 471 F.3d 377, 390

19  (2d Cir. 2006).  As this case was filed on August 14, 2018,

20  were I to impute constructive notice of this case's filing to

21  Borup, the question of timeliness might weigh against

22  intervention here.  However, I have been presented with

23  persuasive rationale why constructive notice should not be

24  imputed here.  First, as I mentioned previously, both here and

25  before the Minnesota court, counsel for Mr. Borup has proffered

1    that his PACER searches did not reveal this case, and that, as

2    a result, he did not become aware of this case until

3    January 31, 2019.  His representations have been consistent,

4    and I do not have a basis to doubt them.  Accordingly, I accept

5    that PACER did not reveal this case and that counsel for

6    Mr. Borup did not know that this case had been filed until

7    January 31, 2019.

8              Also of concern here are the events which took place

9    in Minnesota.  The transcript of the February 26, 2019

10   proceeding before Magistrate Judge Schultz, which I will refer

11   to simply as the transcript, reveals that CJS's Minnesota

12   counsel, including Ms. Kalk, proffered that they themselves did

13   not know that this case had been filed until some point in

14   December 2018.  Transcript at 3:13-20, Docket No. 57-19.  I

15   note, however, that during our last conference, Ms. Kalk

16   clarified that this case was referenced in her firm's billing

17   statements as early as the end of October 2018.  Furthermore,

18   the existence of this case was not disclosed to Judge Schultz

19   at the conference before him on January 22, 2019, despite its

20   relevance to the issues discussed there.  Id. at 3:23 to 5:15.

21   Indeed, Judge Schultz noted that CJS's Minnesota counsel "knew

22   the [Gray] matter existed" and that he felt that "it was not

23   fully candid with the court to not mention that [the Gray]

24   matter existed."  Transcript at 5:5-7.

25             I'm concerned that what Judge Schultz described as a

1    lack of candor may evidence an effort on the part of CJS itself

2    to cabin off this litigation.  While I do not, at this point,

3    ascribe that intent to counsel for CJS, it bears on my analysis

4    of timeliness here – as part of my assessment of the totality

5    of the circumstances in this very fact-specific analysis.

6            Accordingly, in light of the full facts and

7    circumstances, as presented to me, I decline to impute

8    constructive notice of this case to Mr. Borup and accept his

9    counsel's proffer that he first became aware of this case on

10   January 31, 2019.  As a result, any prejudice to the parties

11   stemming from the 21-day delay between the date that counsel

12   became aware of this case and the date on which he filed this

13   motion is minimal.  On the other hand, there is a palpable

14   potentiality that the plaintiffs here could benefit from

15   Borup's intervention, distinguishing plaintiffs from

16   plaintiff's counsel.

17           Accordingly, in light of the full facts and

18   circumstances presented, I find Borup's intervention to be

19   timely.

20           2.  Common question of law or fact:

21           For the reasons which follow, I find that the

22   Minnesota litigation and this case share common questions of

23   law and fact.

24           The Borup complaint defines the relevant FLSA

25   collective as "all individuals who were classified as

1   independent contractors while performing consulting work for

2   The CJS Solutions Group LLC d/b/a The HCI Group...in the United

3   States, for the maximum time period as may be allowed by law."

4   Docket No. 40-6, paragraphs 7 to 10.  The Gray complaint

5   defines the relevant FLSA collective as "all individuals who

6   were classified as independent contractors by defendant that

7   currently work, or have worked, for defendant as an ATE [at the

8   elbow] or any other similarly titled hourly paid position,

9   during the applicable statute of limitations period and have

10  not already released their claims."  Complaint, paragraph 25.

11          As pleaded, the two complaints, by my lights, have

12  clearly overlapping definitions of the relevant FLSA

13  collective.  Both are nationwide, both cover the "at-the-elbow"

14  consultants at issue in both cases, and both extend to the

15  maximum period covered by law.  This is, in part, why the two

16  putative collectives already share one member, Mr. Backers.  I

17  note that counsel for the plaintiffs in the Gray matter has

18  described the scope of the FLSA collective as substantially

19  more narrow than what's provided for in the pleading during the

20  course of today's conference.

21          Initially, the Minnesota litigation focused on a

22  particular subset of the at-the-elbow consultants who worked at

23  the Mayo Clinic.  However, Judge Schultz permitted discovery of

24  a wider swath of potential collective members, including the

25  plaintiffs here, in the Gray case, in part because the Borup

1    complaint is pleaded so as to encompass the collective here.

2    At least I understand that to be a portion of the basis for the

3    judge's determination.  In sum, despite the fact that the two

4    plaintiffs held different titles at different facilities, as I

5    understand it, they were both at-the-elbow contractors who have

6    pled essentially duplicative FLSA collectives against the same

7    defendant.  Given the facial overlap of the pleadings and the

8    clearly present common questions, I conclude that the two cases

9    share multiple common questions of law and fact.

10              3.   Undue prejudice or delay:

11              Nor does granting Mr. Borup's motion create a risk of

12   undue prejudice or delay.  I am sensitive to the fact that the

13   parties here, in this case, have engaged in protracted

14   negotiations, resulting in their proposed settlement, which is

15   currently before me for review pursuant to Cheeks.  However, as

16   counsel for Borup expressed in our last conference, the fact

17   that a settlement has been proposed is not necessarily

18   indicative of a quick payout for the putative collective here.

19   I have not substantively reviewed the settlement, and I take no

20   position on its adequacy.  I simply note that Judge Schultz and

21   the district court in Minnesota, given the advanced posture of

22   the Minnesota litigation, and the district court's exposure to

23   the facts may be well positioned to make a determination -- may

24   be better positioned to make a determination regarding the

25   adequacy of the settlement.

1       I am concerned that any risk of prejudice or delay

2   here would stem from the risk that I grant Mr. Borup's motion

3   to transfer.  However, any such delay or prejudice is

4   consistent, to some degree, with the underlying purpose of the

5   FLSA, to "extend the frontiers of social progress by ensuring

6   to all our able-bodied working men and women a fair day's pay

7   for a fair day's work."  Cheeks v. Freeport Pancake

8   House, Inc., 769 F.3d 199, 206 (2d Cir. 2015) - which requires

9   that the Court ensure fair settlements for putative FLSA

10  collectives.  See id. at 206 (grounding its decision "in the

11  unique policy considerations underlying the FLSA").  In that

12  context, I don't believe that the risk to the settlement here

13  or risk of delay is undue because it permits a comprehensive

14  evaluation of the settlement by a single judge, who has full

15  knowledge of the issues presented on a broader basis.

16      I'm also concerned by what appears to be CJS's

17  strategic decision to cabin off this litigation from the

18  Minnesota litigation.  CJS's strategic decision to cabin off

19  this litigation from the Minnesota litigation may have had an

20  adverse impact on the valuation of the case here.  I take no

21  position on that issue beyond noting its existence.  However,

22  given the potential risk to the putative collective and the

23  broad purpose of the FLSA, I find that any prejudice or delay

24  caused by granting Mr. Borup's motion is not undue.  Rather,

25  any such delay of, or prejudice to, the proposed settlement

1    reached here seems to serve the useful purpose of ensuring that

2    the court best positioned to review the settlement, and to

3    safeguard the interests of the putative collective, is deciding

4    the case.  Accordingly, I do not find that granting Mr. Borup's

5    motion would lead to undue prejudice or delay.

6         Additionally, as I note from counsel for Mr. Borup's

7    comments, the underlying case in Minnesota benefits from a

8    tolling order by the Court that reduces the substance, or the

9    weight, of the concern articulated by counsel for the Gray

10   plaintiffs regarding the potential adverse effect of the delay

11   in the resolution of the case, if indeed this transfer results

12   in such a delay.

13        4.  Conclusion:

14        As I've determined that Mr. Borup's application to

15   intervene is timely made, that there are common questions of

16   law and fact between the cases, and that granting the motion

17   will not result in undue prejudice or delay, I exercise my

18   discretion to grant Mr. Borup's motion to intervene.

19        II.  Transfer:

20        Having granted Mr. Borup permission to intervene, I

21   turn now to his motion to transfer the case to Minnesota.  For

22   the reasons that follow, that motion is granted.

23        (a)  Standard:

24        The first-filed rule is a "well settled principle in

25   this circuit that 'where there are two competing lawsuits, the

1    first suit should have priority, absent the showing of balance

2    of convenience...or...special circumstances...giving priority

3    to the second.'"  First City Nat'l Bank & Trust Co. v. Simmons,

4    878 F.2d 76, 79 (2d Cir. 1989).  This is in keeping with the

5    general rule among federal district courts to avoid duplicative

6    litigation.  See, e.g., Colorado River Water Conservation

7    District v. United States, 424 U.S. 800, 817 (1976).

8           "The Second Circuit has emphasized the importance of

9    establishing a single determination of a controversy between

10   the same litigants.  However, given the complex problems that

11   can arise from multiple federal filings, the disposition of a

12   second-filed case is not governed by a rigid test, but requires

13   instead that the district court consider the equities of the

14   situation when exercising its discretion."  Wyler-Wittenberg v.

15   MetLife Home Loans, Inc., 899 F.Supp.2d 235, 247 (E.D.N.Y.

16   2012)(transferring FLSA collective pursuant to the

17   first-to-file rule)(alterations, quotations and quotation marks

18   omitted).  In order for the "first-filed" rule to apply, there

19   must be "identical or substantially similar parties and claims

20   present in both courts."  In re Cuyahoga Equip. Corp., 980 F.2d

21   110, 116-17 (2d Cir. 1992).  However, in this circuit,

22   substantially similar does not require that the parties and

23   issues be identical.  Wyler-Wittenberg, 899 F.Supp.2d at 247

24   (collecting cases).

25           "A change of venue is appropriate if:  (1) the

1    plaintiff could have brought the case initially in the proposed

2    transferee forum; and (2) transfer would promote the

3    convenience of the parties and witnesses and the interest of

4    justice." id. at 248 (alterations omitted, capitalization

5    altered).  In deciding a Section 1404(a) motion to transfer,

6    the first question a court must ask is whether the case could

7    have been brought in the proposed transferee district.  Herbert

8    Ltd. Partnership v. Elec. Arts, Inc., 325 F.Supp.2d 282, 285

9    (S.D.N.Y. 2004).  If the case could properly have been filed in

10   the proposed transferee district, the court determines whether

11   transfer actually is appropriate by weighing various private-

12   and public-interest factors.  Courts in the Second Circuit

13   generally consider the following nonexclusive list of factors

14   in determining whether transfer is appropriate in a given case:

15            (1)  The convenience of the witnesses and the

16   availability of process to compel the attendance of unwilling

17   witnesses;

18            (2)  The convenience of the parties;

19            (3)  The location of relevant documents and the

20   relative ease of access to sources of proof;

21            (4)  The locus of operative facts;

22            (5)  The relative means of the parties;

23            (6)  The comparative familiarity of each district with

24   the governing law;

25            (7)  The weight accorded to the plaintiff's choice of

1   forum;

2          And (8) judicial economy and the interests of

3   justice."

4          Bank of America N.A. v. Wilmington Trust FSB, 943

5   F.Supp.2d 417, 426 (S.D.N.Y. 2013).

6          The "consideration of the 'interest of justice' factor

7   encompasses the private and public economy of avoiding multiple

8   cases on the same issues."  Williams v. City of New York, 2006

9   WL 399456 at *3 (S.D.N.Y. February 1, 2006)(quoting Continental

10  Grain Co. v. Barge FBL-585, 364 U.S. 19, 26 (1960)("to permit a

11  situation in which two cases involving precisely the same

12  issues are simultaneously pending in different district courts

13  leads to the wastefulness of time, energy and money that

14  Section 1404(a) was designed to prevent").  The existence of a

15  related action in the transferee district is a strong factor to

16  be weighed with regard to judicial economy and may be

17  determinative.  See, e.g., Citicorp Leasing, Inc. v. United

18  Amer. Funding, Inc., 2004 WL 102761 at *6 (S.D.N.Y. January 21,

19  2004.)  "The judicial economy factor is a separate component of

20  the court's Section 1404(a) transfer analysis and may be

21  determinative in a particular case."

22          (b)  Application:

23          It is an undisputed fact that the Minnesota litigation

24  was filed prior to this one, and as I discussed previously,

25  there is a substantial overlap between the FLSA actions as both

1   deal with at-the-elbow consultants and payment of them, and

2   both cases have been broadly pled, such that the putative

3   collectives are duplicative, in part, of each other.

4   Accordingly, this case falls within the ambit of the

5   first-filed rule, which, while discretionary, weighs heavily in

6   favor of transfer.  Indeed, the existence of the related action

7   in Minnesota demonstrates that there are substantial

8   efficiencies to be gained by avoiding duplicative litigation

9   here.

10          Furthermore, as I have previously articulated, I am

11  somewhat concerned by the fact that this case was not

12  seasonally disclosed to Judge Schultz.  While I will not go so

13  far here as to determine that a reverse auction took place, the

14  fact that CJS took steps to cabin off these litigations from

15  each other is at least indicative evidence of a reverse

16  auction.  And regardless of whether CJS intentionally created a

17  reverse auction, the existence of multiple cases covering the

18  same FLSA collective pending here and in Minnesota is a

19  duplicative and inefficient allocation of judicial resources

20  coupled with a real risk of harm to the interests of the

21  putative collectives.  Accordingly, judicial economy and the

22  interests of justice strongly compel transfer here.

23          Nor does this case present one of the "special

24  circumstances" in which I might feel compelled to depart from

25  the first-filed rule.  As Borup pointed out during the April 5,

1    2019 conference, the existence of tolling agreements here and

2    in the Minnesota litigation, most importantly in the Minnesota

3    litigation, safeguard the plaintiffs against the risk of their

4    claims expiring during any delay caused by transfer if these

5    claims are covered by the claims covered by the district

6    court's order there.  And the case law I have cited makes it

7    very clear that there is no categorical rule preventing the

8    application of the first-filed rule to opt-in FLSA collectives.

9    Rather, in a case such as this, where there are indicia of a

10   reverse auction implemented by the defendant with full

11   knowledge of both pending cases, my obligation to protect the

12   interests of the collective counsels towards transferring this

13   case to the court best positioned to evaluate any settlement at

14   issue.

15        None of the other seven 1404(a) factors weighs

16   strongly against transfer.  Ms. Gray worked in New York, and so

17   her choice of forum here is given some weight.  However, she

18   has pled that she "and other similarly situated ATEs were

19   subject to defendant's uniform policies and practices..."

20   complaint at paragraph 24.  Her claim that she was the victim

21   of a "universal" policy has at least some support in the fact

22   that the Mayo Clinic-based plaintiffs in Minnesota have such

23   similar claims to the New York plaintiffs.  So while it may be

24   slightly more convenient for Ms. Gray herself to litigate her

25   case here, and her individual facts have a nexus to this forum,

1   the collective claims have no strong nexus with this district.

2   Accordingly, this factor weighs only slightly against transfer.

3           And while transfer will, of course, increase the

4   geographical distance between the adjudicating court and the

5   New York events and witnesses, any inconvenience caused by such

6   distance would be relatively minor and may be outweighed by the

7   benefits of access to the Minnesota evidence and

8   putative-collective members, who may provide substantial

9   assistance in litigating this case.  Of course, this assumes

10  that this particular settlement is not simply endorsed by the

11  Minnesota court.

12          Indeed, ultimately, the Minnesota evidence and

13  witnesses may prove just as relevant to the Gray putative

14  collective as the New York evidence is, and nor can CJS claim

15  any inconvenience, as it is already litigating in Minnesota.

16          Similarly, I have not been presented with an adequate

17  basis upon which I could conclude that transfer would

18  meaningfully prejudice the parties here by interfering with

19  their settlement negotiations.  As I've discussed, this case,

20  despite having been filed second and been seemingly cabined off

21  by the Minnesota litigation by CJS, that restriction and the

22  free flow of information may have had an adverse impact on the

23  value of the settlement negotiated here.  Again, I take no

24  position on that issue, but note that the Minnesota court is

25  best positioned to make those determinations on a comprehensive

1   basis and to safeguard the interests of the putative

2   collective.

3           I do not assume necessarily that the transfer will

4   give rise to a delay.  The Minnesota court can evaluate this

5   proposed settlement as proffered by the Gray plaintiff and the

6   defendant, CJS.  The Minnesota court can evaluate how it is

7   that they wish to approach the proposed settlement.  The court

8   may accept the arguments proffered by counsel for the Gray

9   plaintiffs and by CJS that this settlement is appropriate and a

10  fair, reasonable compromise of the claims, and the district

11  court in Minnesota may also conclude, as advocated by the Gray

12  plaintiffs and CJS, that it will be in the best interests of

13  the opt-in collective members for the court to promptly

14  evaluate and approve that settlement.

15          I emphasize that I take no position on how it is that

16  the Minnesota court will or should treat this settlement that

17  has been presented to the court.  They will make their own

18  independent judgment.  The Minnesota court is capable of

19  considering the New York law with respect to any New York

20  law-related claims.

21          Finally, I note that the location of relevant

22  documents is of minor concern, given the realities of

23  electronic records, nor does it appear that litigating in

24  Minnesota meaningfully impacts the availability of witnesses or

25  evidence or implicates the means of the parties in either case.

1    And, of course, the Minnesota court is equally familiar with

2    the FLSA as I am and, as I said earlier, is capable of applying

3    any relevant state law.

4         So, for all of these reasons, I find that the

5    first-to-file rule, judicial economy, and the interests of

6    protecting the putative collective here weighs strongly in

7    favor of the transfer, and that the countervailing factors hold

8    minimal weight.  Accordingly, for all of those reasons, again,

9    I'm granting Mr. Borup's motion, and I am transferring this

10   case to the District of Minnesota.  I will follow up on this

11   oral decision with a written order to that effect either

12   tonight or tomorrow morning.

13        So, counsel, thank you very much for your patience as

14   I read through my analysis of this issue.

15        As I just said, I'll issue a separate order ordering

16   the transfer of this case to the District of Minnesota without

17   delay.  As I said earlier, I do not take any position regarding

18   the merits of the proposed settlement here or how it is that

19   the District of Minnesota will or should adjudicate the

20   reasonableness of that settlement.  That's now up to the

21   district court in Minnesota, and counsel here are free to make

22   whatever arguments you like to that court regarding the

23   importance of timely approval of that settlement and your

24   desire not to couple it with the litigation going forward in

25   Minnesota.

J49KGRAM                    TELEPHONE CONFERENCE

1            So I think that that completes my comments.  I should

2    say, to the extent that you haven't heard it already, there's a

3    strong vein in my comments, CJS's decision to settle this case

4    separately while aware of the separately pending Minnesota

5    action has certainly weighed in my consideration here, and I

6    have considered that in making my decision that unified review

7    of all of the claims involved here is appropriate.

8            Anything else that we should take up here?  First,

9    counsel for plaintiff?

10           MR. STEPHAN:  No, your Honor.

11           THE COURT:  Thank you.

12           Counsel for CJS?

13           MS. USENHEIMER:  No.  Thank you.

14           THE COURT:  Thank you.

15           Counsel for Mr. Borup?

16           MR. SNODGRASS:  No, your Honor.

17           THE COURT:  Good.  Thank you, all.

18                              * * *

19

20

21

22

23

24

25